

RECEIVED

USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 2, 22, 2009

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| NORA M. HAWK | CIVIL ACTION NO. 05-0936 |
| VERSUS | JUDGE DONALD E. WALTER |
| CENTURY TELEPHONE ENTERPRISES, ET AL. | MAGISTRATE JUDGE HORNSBY |

## RULING ON THE MERITS

In accordance with the Memorandum Order [Doc. #32] issued in this case, the parties have submitted this case on briefs. After having reviewed the briefs and all evidence presented, the Court makes the following findings, and **DISMISSES** all claims by Hawk against Defendants.

## STATEMENT OF THE CASE

Plaintiff, Nora M. Hawk ("Hawk"), brings this action against Century Telephone Enterprises, Inc. ("Century Tel"), her former employer, Century Telephone Enterprises, Inc. Employee Benefit Plan (the "Century Tel Plan"), Century Telephone Enterprises, Inc. Plan Administrator and the Prudential Insurance Company ("Prudential") under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.*, ("ERISA") seeking damages and disability payments for Defendants' allegedly improper termination of her long term disability ("LTD") benefits in May 1999, and offset of her benefits based on Social Security Disability payments.

Century Tel established an employee welfare benefit plan that provided coverage to its employees for long-term disability benefits under specified terms and conditions. Hawk asserts that the governing Plan is that document marked as Plaintiff's Exhibit 2, Plan Document and Summary Plan Description ("SPD"), while Defendants assert that the governing Plan document is marked as

Defendants' Exhibit A, Century Tel Long Term Disability Coverage insurance policy (the "Policy"), Pru-Hawk 0001-0070. It is undisputed that Prudential insured the Century Tel LTD Plan under Group Insurance Contract No. G-47279. It is undisputed that Hawk was a participant in the Plan and a covered employee insured by the Policy.

Hawk was employed by Century Tel as a Customer Service Specialist from March 1991 until approximately February 20, 1997, when Hawk asserts she became disabled due to chronic severe back pain. [Pru-Hawk 0201-0204]. On May 5, 1997, Hawk applied for disability benefits with Prudential. *Id.*

Regardless of whether the Policy or the SPD is the ERISA Plan, both documents state that to qualify for LTD benefits the Plan participant must meet the following contractual requirements:

(1) Because of Sickness/Illness or Accidental Injury, the plan participant is (a) not able to perform for wage or profit the material and substantial duties of *her occupation*, and (b) not able to perform for wage or profit the material and substantial duties of *any job* for which she is reasonably fitted by her education, training or experience;

(2) She is not working at any job for wage or profit; and

(3) She is under the regular care of a Physician.

[Policy, p. 19, Pru-Hawk 0021; Plaintiff's Exh. 2, SPD, p. 116 (emphasis added)].

Hawk's claim for LTD benefits was initially approved, effective May 17, 1997, and correspondence informing Hawk of that approval was sent by Prudential to Hawk on June 11, 1997. [Pru-Hawk 0519-0521].

On February 27, 1998, Hawk submitted to an independent medical evaluation ("IME") conducted by James D. Dossey, M.D., which, according to the IME report, was requested by Professional Appointment Services for Prudential. [Pru-Hawk 0190-0195]. In his report, Dr. Dossey

2

noted that his only objective finding was restricted range of motion in Hawk's back. [Pru-Hawk 0193-0194]. Dr. Dossey opined that although Hawk could not return to the Customer Service Representative job based on his knowledge of the prolonged sitting required for that job, Hawk could safely operate in other jobs that allowed frequent changes of position, periods of walking and moving around, and a limitation of lifting no more than 10 to 20 pounds. [Pru-Hawk 0194]. Dr. Dossey noted that Hawk "could safely operate in other jobs which she ha[d] successfully performed" such as Purchasing and Inventory Specialist, Commission Specialist, and Accounting Specialist. [Pru-Hawk 0195].

Prudential determined that Hawk was totally disabled from performing her own occupation due to the amount of sitting and inability to change positions. [Pru-Hawk-0084]. On the other hand, Prudential determined that Hawk was not totally disabled from performing any occupation. *Id.* Therefore, Prudential advised Hawk by letter dated May 13, 1998, that based on the medical information on file, Hawk would not meet the definition of "total disability", effective May 17, 1999. [Pru-Hawk 0851-0852].

At the end of May 1998, Prudential requested a vocational evaluation from Concentra Managed Care, Inc. ("Concentra"). Concentra performed an initial evaluation of Hawk's vocational status and reported on the same in June 1998. [Pru-Hawk 0164-0166]. Concentra provided Prudential with information regarding multiple positions falling within Hawk's abilities and experience. [Pru-Hawk 0846-0847]. These positions provided an average salary of $16,000 to $20,600, including benefits. [Pru-Hawk 0154]. Concentra drafted a resume for Hawk and identified three prospective positions. *Id.* Concentra asserts that when Hawk was contacted about these positions, she stated "I have no intention of doing anything." *Id.* At the end of July 1998,

3

Concentra issued a LTD Closure Report, in which the case manager noted that its file on Hawk was to be closed due to "employee non-compliance" and her alleged failure to follow through with job placement recommendations. *Id.*

In October 1998, Prudential learned that Hawk was awarded Social Security Disability Benefits ("SSDB") for herself and her son, effective August 1, 1997. [Pru-Hawk 0369-0380]. At that time, Prudential wrote Hawk and acknowledged Hawk's receipt of her SSDB award. [Pru-Hawk 0369]. Prudential advised Hawk that the SSDB payments were to be offset from her LTD benefits under the CenturyTel Policy. *Id.* Prudential was later informed that effective March 1, 1998, Hawk's SSDB payments were to be calculated based upon her husband's account. [Pru-Hawk 0360-0361]. Thus, Hawk's LTD benefits were allegedly adjusted to reflect an offset only for her primary award. [Pru-Hawk 0092; Defendant's Statement of Undisputed Material Facts, ¶24].

In March 1999, Hawk appealed Prudential's determination to deny benefits before the Initial Duration expired on May 17, 1999. [Pru-Hawk 0332-0333]. With her appeal, Hawk provided Prudential the SSDB award letter. [Pru-Hawk-0332-0340]. The Social Security Administration's award was fully favorable. *Id.* Hawk provided no additional medical documentation beyond that already on file with Prudential. *Id.*; [Defendant's Statement of Undisputed Material Facts, ¶26; Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, ¶26].

On April 30, 1999, Prudential advised Hawk through counsel that it had received her appeal and the SSDB award letter that had previously been considered. [Pru-Hawk 0330-0331]. Prudential "re-reviewed" Hawk's claim and again determined that she was "capable of performing the material and substantial duties of another occupation." *Id.* Prudential further advised that if Hawk wished Prudential to consider additional medical documentation, it would postpone its decision until after

4

such information had been received and reviewed. *Id.* Prudential then itemized the medical documentation it held in support of Hawk's LTD benefits claim. *Id.* Hawk was given the option of either providing any additional medical documentation directly to Prudential or providing Prudential with a signed medical release authorization and a list of treating physicians from whom Prudential could obtain such documentation. *Id.*

On May 24, 1999, Prudential again contacted Hawk through counsel and advised that since they had not received a response from Hawk to the April 30-letter, they would close Hawk's appeal. [Pru-Hawk 0300]. Hawk's counsel, Sidney Zeller ("Zeller"), responded on June 11, 1999, and asserted that Hawk believed the record as held by Prudential did not support Prudential's decision to deny Hawk LTD benefits. [Pru-Hawk 0327-0328]. Zeller advised Prudential that updated medical records would be forthcoming. *Id.*

As of February 18, 2000, Hawk retained new counsel, James Woods ("Woods"), who wrote Prudential seeking information regarding reopening Hawk's appeal. [Pru-Hawk 0313-0314]. On April 24, 2000, Woods, on behalf of Hawk, advised Prudential that he was in the process of gathering additional medical documentation to supplement the Administrative Record. [Pru-Hawk 0294]. On May 11, 2000, Prudential provided Hawk a "claimant statement" form and "authorization to release medical information" form for completion by Hawk. [Pru-Hawk 0286-0291]. Hawk's claim was delayed because she did not provide Prudential with the completed "claim statement" form and the "authorization to release medical information" until November 10, 2003. [Pru-Hawk 0102]. Shortly after receiving both forms, Prudential gathered Hawk's updated medical records from her treating physicians. *Id.*; [Pru-Hawk-0132-0143]. Upon receipt of all updated information,

Prudential sent Hawk's file to Dr. Joel Moorhead, a Pain Management and Rehabilitation physician, for an external review. [Pru-Hawk 0104; Pru-Hawk 0562-0571; Pru-Hawk 0129].

In performing his external review, Dr. Moorhead reviewed all of Hawk's medical records dating from January 1997 through February 2004. [Pru-Hawk 0104; Pru-Hawk 0562-0571]. Dr. Moorhead ultimately determined that Hawk was capable of performing sedentary light duty and he opined that the restrictions (lifting no more than 10 to 20 lbs and the ability to shift positions) previously identified by Dr. Dossey were appropriate. [Pru-Hawk 0562-0571]. Dr. Moorhead also noted that Hawk's records were devoid of any evidence of complications following her back surgeries, and lacked support for her complaints of pain. *Id.*

Prudential upheld its previous determination to terminate Hawk's benefits effective May 17, 1999. [Pru-Hawk 0124-0126]. On March 10, 2004, Prudential mailed Hawk's counsel a letter regarding the same, informing Hawk that the medical documentation contained in the file did not support a finding of an impairment preventing her from performing any occupation for which she was qualified. *Id.*

Hawk filed her lawsuit on May 31, 2005, after receiving the letter of denial from Prudential. [Doc. #1]. Defendants filed a joint Motion for Summary Judgment [Doc. #19], which Hawk opposed [Doc. #25]. Defendants' Motion for Summary Judgment was denied due to the Court's decision to determine the matter on the record. [Doc. #38]. The Court ordered the parties to provide the administrative record, plan documents, joint stipulated facts, and briefs on the merits. [Doc. #32].

## LAW AND ANALYSIS

### I. Prudential's Decision to Deny Long Term Disability Benefits

#### A. Standard of Review

The threshold issue in this case is whether Prudential or CenturyTel is the named Plan Administrator under the Plan. Hawk asserts that under the terms of the SPD, Prudential was neither a named Plan Administrator vested with discretionary authority nor a fiduciary, and its decision to deny benefits is entitled to no deference. On the other hand, Defendants assert that under the terms of the Policy, Prudential is "clearly the claims administrator", and that even if the Policy is not considered the Plan document, that Prudential's claim decisions are entitled to deference as a Plan Fiduciary.

An administrator's denial of benefits under an ERISA plan is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If discretion is granted, the "abuse of discretion" standard applies. *See id.*, 489 U.S. at 111, 109 S.Ct. at 954. Where the plan does not expressly give the administrator discretionary authority, a plan administrator's or fiduciary's factual determinations are nonetheless reviewed for abuse of discretion. *See Pierre v. Connecticut General Life Ins. Co.*, 932 F.2d 1552, 1558-59 (5th Cir. 1991).

To resolve the standard of review issue, the Court must first address the clear conflict between the terms of the SPD, relied upon by Hawk, that specifically declares CenturyTel to be the Plan Administrator and Sponsor, and the terms of the Policy, relied upon by Defendants, that provides for disability (temporary or long term) only when Prudential determines the beneficiary is

7

entitled to the benefits sought.[1]  The Fifth Circuit has provided guidance in such circumstances:

> ERISA requires plan administrators to provide its participants with an accurate, comprehensive, and easy to understand summary of the Plan.[2]  The SPD is intended to simplify the language of the plan, allowing the average plan participant to understand his rights and duties.  The SPD is interpreted as a whole.  If the language of the SPD conflicts with the language of the Plan, the SPD is given effect. Ambiguities in the SPD are resolved in favor of the qualified beneficiary.  We have rejected the notion that the SPD should be interpreted in light of the language of the Plan.  It is the SPD and not the Plan upon which the average beneficiary has relied; the SPD most nearly represents the intention of the parties.

*Fallo v. Piccadilly Cafeterias, Inc.*, 141 F.3d 580, 583-84 (5th Cir. 1998) (internal citations omitted).

After a review of the SPD dated October 1, 1996, this Court finds that Century Telephone Enterprises, Inc., is the named Plan Administrator.  The SPD specifically states:

> You have a right to know the name, address and telephone number of the Plan Administrator, who is the agent for service of process for the Plan.  This information is as follows:
> > Century Telephone Enterprises, Inc.
> > 100 Century Park Drive
> > Monroe, Louisiana 71203
> > (318) 388-9000.

[Plaintiff's Ex. 2, SPD at 136.]    This language is unambiguous and is therefore controlling.

Likewise, this Court finds that Century Telephone Enterprises, Inc., is specifically named the Plan

Sponsor in the SPD as follows: "the Plan Sponsor is Century Telephone Enterprises, Inc." *Id.*

Next, the Court must determine Prudential's relationship to the Plan.   Hawk asserts that

---

[1]     Although it is clear to the Court that the discrepancy between the plan and the policy is the result of an error in the drafting of the SPD, it is the language of the SPD which controls the analysis. *See infra.*

[2]     "The summary plan description ... shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1).

Prudential is not a fiduciary because the SPD does not delegate any fiduciary responsibilities to Prudential. Defendants argue that even if Prudential is not the Plan Administrator, Prudential's decisions regarding claims are still entitled to deference because Prudential is a Plan Fiduciary. The term "fiduciary" is to be broadly construed. *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984). "Fiduciary should be defined not only by reference to particular titles, [] but also by considering the authority which a particular person has or exercises over an employee benefit plan." *Id.*

A person or entity may become an ERISA fiduciary not only by being named as such in the benefit plan, but also by exercising discretionary control or authority over the plan's management, administration, or assets. *Mertens v. Hewitt Associates*, 508 U.S. 248, 251, 113 S.Ct. 2063, 2066 (1993). ERISA defines a benefit policy guaranteed by an insurer as an asset of the plan. *See* 29 U.S.C. §1101(b)(2). As such, if the insurance company has discretionary authority to grant, deny, or review denied claims, it will qualify as a fiduciary. *See Reich v. Lancaster*, 55 F.3d 1034, 1046-1047 (5th Cir. 1995). "Discretion is the benchmark for fiduciary status under ERISA." *Id.* at 1048; citing *Maniace v. Commercial Bank*, 40 F.3d 264, 267 (8th Cir. 1994).

It is the Court's determination that Prudential qualifies as an ERISA fiduciary. The SPD specifically states:

> Long Term Disability insurance is underwritten by The Prudential Insurance Company of America under policy number G-47279. This benefit is part of the Century Telephone Enterprises, Inc., Employee Benefit Plan.

[Plaintiff's Ex. 2, SPD at 110]. Although the SPD does not specifically grant Prudential authority, a fiduciary relationship exists due to Prudential's discretion under the policy to grant or deny claims for disability. [Pru-Hawk 0021]. Prudential policy number G-47279 provides Prudential with the discretion to determine when a claimant meets the definition of "total disability". [Pru-Hawk

0021]. The policy requires that Prudential be given written notice of a potential claim, along with proof of loss. [Pru-Hawk 0037]. The term "Total Disability" is defined under the policy and is found to exist *when Prudential determines* that all of the required conditions are met. [Pru-Hawk 0021(emphasis added)]. Further, Prudential is provided the right under the policy to require that claimant undergo a physical examination as often as reasonable while her claim was pending. [Pru-Hawk 0038]. Based on the foregoing, it is clear to the Court that Prudential is a Plan Fiduciary, despite the fact that the plan granted it no express authority.

Having found that CenturyTel is the named Plan Administrator and Plan Sponsor as stated in the SPD, but that Prudential is a Plan Fiduciary, the Court must now determine the proper standard of review.[3] The decision to terminate Hawk's LTD was made by Prudential, a Plan Fiduciary. As discussed *supra*, the denial of benefits under a ERISA plan is generally reviewed under a *de novo* standard. *Brunch*, 489 U.S. at 115, 109 S.Ct. at 956. However, an abuse of discretion standard is applied "when the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 114, 109 S.Ct. at 956-957. Even if the plan does not expressly provide discretionary authority, the abuse of discretion standard is applicable for mere factual determinations. *See Vercher v. Alexander & Alexander, Inc.*, 379 F.3d 222, 226-227 (5th Cir. 2004). When a conflict of interest exists, such as in the case

---

[3]    Ordinarily, the Plan is the proper party defendant. *See* 29 U.S.C. § 1132(d)(2). However, where the employer is the Administrator or Sponsor, or makes the decision to deny benefits, it too is a proper party defendant in an ERISA suit. *Musmeci v. Schwegmann Giant Supermarkets, Inc.*, 332 F.3d 339, 349 (5th Cir. 2003). The parties have not raised the issue of proper party defendant but the Court notes that, based on this Court's factual findings that the SPD names CenturyTel, Hawk's employer, as Plan Sponsor and Administrator, and that Prudential, the insurer of the Plan, maintains a fiduciary relationship with the Plan, all named defendants are properly before this Court. *See Bruch*, 489 U.S. at 110, 109 S.Ct. at 954; *see also Musmeci*, 332 F.2d at 349.

where a plan fiduciary and the insurer are one and the same, the Court will apply a "sliding scale" abuse of discretion standard. *See Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 296 (5th Cir. 1999). Under this approach, the existence of a potential conflict of interest is simply a factor in determining whether the administrator abused its discretion in denying the claim. *Id.* Because a conflict exists in this matter, Prudential's factual determinations will be reviewed under the abuse of discretion standard, but with the least amount of deference.

The interpretation of a plan term is reviewed *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Pierre*, 932 F.2d at 1556. As stated *supra*, the SPD contains no delegation of discretionary authority to Prudential. Because Hawk alleges that Prudential improperly interpreted the definition of "total disability" resulting in the denial of her claim, that determination will be reviewed *de novo*. *See Id.* at 1557.

      B.    <u>Review of Medical Records</u>

Hawk originally applied for LTD on May 5, 1997, by completing a Prudential claim form. [Plaintiff's Exhibit C, Pru-Hawk 0201-0203]. Hawk described her disability as lower back pain and spasms, and pain down her left leg. *Id.* She stated that her symptoms interfered with her job performance because sitting caused her lower back to go into muscle spasms. *Id.* Attached to the application was a medical statement by Dr. Ted Warren, Hawk's primary care physician. *Id.* Dr. Warren opined that Hawk was unable to work due to back pain. *Id.*

On January 2, 1997, Dr. Warren indicated that Hawk has a history of low back pain and degenerative joint disease. [Pru-Hawk 0269]. He referenced Hawk's previous surgery for spondylolisthesis at L4, L5, and fusion of L4, L5. *Id.* On this visit, Hawk stated that she walked

11

4-5 times per week, which helped with her pain. *Id.* It was noted that her back had nontender spinous processes, and some mild paraspinous muscle tenderness in the lumbar regions. *Id.* A bilateral leg lift produced mid lumbar pain. *Id.*

On January 10, 1997, Hawk was examined by Dr. Smith, a neurosurgeon. [Pru-Hawk 445-446]. Dr. Smith noted that Hawk had a lumbar operation with a fusion incorporating instrumentation with plates and pedicle screws in 1994. *Id.* Hawk indicated that she had increased pain with some radiation into her left hip and leg. *Id.* Her examination revealed that she had a relatively normal gait. *Id.* The range of motion of her lower back was moderately limited. *Id.* Dr. Smith found no overt spasm, list or scolioisis, and there was no sciatic tenderness. *Id.* Hawk's motor and sensory exams were normal. *Id.* His impression was that Hawk was suffering from the residuals of her previous lumbar disc disease and operations. *Id.* Dr. Smith also reported that a MRI scan taken January 15, 1997, was normal with no findings of active neurogenic involvement. [Pru-Hawk 0455]. The scan did show postoperative changes and a persistent mild slippage at the fusion, but the fusion appeared intact. *Id.* The MRI revealed no significant defects involving the spinal canal or areas of spinal stenosis. *Id.*

On February 5, 1997, Dr. Warren noted that Hawk continued to have back pain that was caused by sitting at work. [Pru-Hawk 0267]. Hawk indicated that changes in her position helped with the pain. *Id.* Upon examination, her lower back was tender with decreased range of motion. No radicular symptoms were noted in her lower extremities. *Id.* Dr. Warren noted that Hawk's recent MRI showed post operative changes only, and no spinal stenosis. *Id.* On February 20, 1997, Dr. Warren noted that Hawk continued to have pain in her lower lumbar spine, and suggested an appointment would be made with Dr. Balter. [Pru-Hawk 0265].

On February 28, 1997, Hawk was evaluated by Dr. Kevin Balter, an anesthesiologist and pain management specialist. [Pru-Hawk 0448-454]. Hawk indicated that she suffered from lower back pain, provoked by prolonged sitting. *Id.* She described her pain as a constant, severe throbbing, and aching in her lower back. *Id.* She reported that while working as a clerical assistant her pain was reduced by getting up out of her chair. *Id.* Dr. Balter's impression was that Hawk suffered from chronic low back and left buttock pain with mild spondylolisthesis. *Id.* There was no MRI evidence of neurologic compression, and electrodiagnostic tests of the left lower extremity were normal. *Id.* Dr. Balter recommended non-medication options, including topical cream and gradual reconditioning with a medical water exercise program. *Id.* He also recommended a trial with a portable interferential device, which uses electrical currents to reduce swelling, inflammation, and pain. *Id.* On March 12, 1997, Dr. Warren noted that Hawk as not satisfied with the options presented by Dr. Balter. [Pru-Hawk 0264]. He indicated that Hawk would be referred to the Texas Back Institute. *Id.*

On April 7, 1997, Hawk was evaluated at the Texas Back Institute. [Pru-Hawk 0409-0411]. Dr. John Regan suggested that bilateral facet blocks could help with her pain, which was performed the next day. She was later prescribed a hardware injection. [Pru-Hawk 0426]. Hawk reported that the pain returned shortly after the injection. [Pru-Hawk 0408]. On July 15, 1997, Dr. Regan removed the hardware in her back to reduce her pain, noting that her fusion appeared to be solid. [Pru-Hawk 0424]. Hawk indicated in follow-up appointments on August 1, 1997, and October 15, 1997, that her condition had improved following the removal of the hardware, but she still had problems with her back and left leg. [Pru-Hawk 0398-0399].

Prudential requested that Dr. James Dossey conduct an Independent Medical Examination ("IME"), which was performed February 27, 1998. [Pru-Hawk 0190-0195]. Dr. Dossey examined Hawk, who described her symptoms as follows: a constant numbness in her left thigh and buttocks; muscle spasms in her left thigh and buttocks; and increased pain in her left thigh and buttocks and in her lower back. *Id.* Hawk reported that her symptoms increased by sitting longer than ten minutes and that she tended to shift her posture throughout the day. *Id.* Hawk described her lifestyle activities, which included water aerobics three times weekly and walking one-half mile per day. *Id.* She also indicated that she was able to cook her meals and wash her own laundry, but otherwise performed no other household chores. *Id.* Dr. Dossey noted in his physical exam that Hawk was able to sit, stand, and move from a seated to standing posture without difficulty. *Id.* Dr. Dossey noted that Hawk's back range of motion was limited to 30 degrees of flexion and she could rotate to the left and right 30 to 40 degrees. *Id.* Dr. Dossey noted that he only observed Hawk sitting for about five minutes before Hawk asked if she could stand. *Id.* Dr. Dossey noted that her physical exam failed to reveal any neurologic findings, which was consistent with her previous examiners. *Id.* There were no objective findings, other than a restriction of back motion. *Id.* The report concluded with Dr. Dossey opining that Hawk was capable of returning to productive work, but she would need to be limited from lifting more than 10 to 20 pounds, be able to frequently alternate her posture, and occasionally recline. *Id.* Dr. Dossey opined that Hawk could not return to her previous position as a Customer Service Representative, but she could safely perform other jobs such as a Purchasing and Inventory Specialist, Commission Specialist, or Accounting Specialist. *Id.*

On June 6, 2002, Hawk was evaluated by Dr. Bernie McHugh, a neurosurgeon. [Pru-Hawk 0603-0606]. He noted that Hawk's cervical spine was nontender to palpation and capable of a full

range of motion with flexion and extension. *Id.* Her thorocolumbar spine yielded similar results, including a normal range of motion in her lower back with flexion and extension. *Id.*

On June 14, 2002, a MRI was performed on Hawk's lumbar spine. Grade 1 anterior spondylolisthesis of the L4 and L5 was noted. A disk bulge was noted at L3-4 and L5-S1. [Pru-Hawk 0623-0624].

On July 2, 2002, Dr. McHugh noted that there was an obvious collapse of disk space at L4-5 and L5-S1, with foraminal stenosis noted. [Pru-Hawk 0602]. He also noted that a MRI scan showed postoperative changes at the L5-S1 area, including diffuse disk bulging at L4-5 and L3-4 areas. *Id.* A possible synovial cyst was found on the right side. *Id.*

On July 16, 2002, Hawk was evaluated by Dr. Ronald Ellis, a pain care specialist. [Pru-Hawk 0612-0615]. His physical examination revealed that her gait was normal. *Id.* She was able to bend at the waist until her fingertips were 18 to 22 inches from the floor. *Id.* Lower back pain was noted, as well as mild to moderate tensor fascia lata tenderness on the right, and mild midline lumbar and lumbar paraspinous tenderness. *Id.* Hawk also had significant sacroiliac joint tenderness on the right, as well as mild gluteal tenderness. *Id.* Dr. Ellis' impression was of failed back symdrome with chronic lower back pain and left lumbosacral radiculopathy, right sacroiliac joint dysfunction, and secondary muscular tenderness and tightness of the lower back and lower extremities. *Id.* Shortly thereafter, Dr. Ellis gave Hawk local steroid injections to help her pain. [Pru-Hawk 0734-0735]. A second round of steroid shots was administered on August 1, 2002. [Pru-Hawk 0732-0733]. Dr. Ellis saw Hawk again on August 19, 2002, for a follow-up appointment. [Pru-Hawk 0729-0730]. She reported her pain as a 55 on a scale of 100. *Id.* She stated that the steroid injections only relieved her pain for four to five days. *Id.* Dr. Ellis recommended facet and sacroiliac injections,

which Hawk declined. *Id.*

On August 29, 2002, Dr. McHugh noted that a CY myelogram of Hawk's lumbar spine was significant for a L3-4 moderate sized disk bulge with hypertrophy and ligamentous hypertrophy, but without significant stenosis. [Pru-Hawk 0600]. A Grade 1 anterior L4-5 spondylolisthesis was identified, and a small right lateral disk bulges was causing contact on the L4 nerve root. *Id.* Surgery was suggested. *Id.*

In September 2002, Dr. McHugh performed back surgery on Hawk for a L4-L5 decompression with the placement of an interbody BAK cage and screws. [Pru-Hawk 0609]. He noted adhesive scar tissue causing compression on the nerves, which was "taken down". *Id.* Hawk was seen on October 17, 2002 for a follow-up appointment. [Pru-Hawk 0599]. Dr. McHugh noted that Hawk was doing quite well neurologically and reported that she was walking three to four blocks a day. *Id.* In a later follow-up appointment on November 26, 2002, Dr. McHugh noted that Hawk reported her back pain had reduced significantly, although she still experienced intermittent lower extremity pain, predominantly in the evening hours. [Pru-Hawk 0598]. Hawk also reported that she was walking one mile per day. *Id.*

On July 8, 2003, Dr. McHugh noted that Hawk reported to his office with complaints of severe muscle spasms, for which she was prescribed valium. [Pru-Hawk 0596]. He suggested that Hawk see Dr. Ellis regarding her pain. *Id.*

On October 13, 2003, Hawk was examined by Dr. Ellis. He noted that she suffered from lumbar laminectomy syndrome with low back pain with myofascial pain with trigger points. [Pru-Hawk 0610-0611]. He suggested a trial of trigger point injections, and possibly botox injections if necessary. *Id.* Trigger point injections were administered on October 15, 2003. [Pru-Hawk

0725]. Hawk returned for another appointment on October 28, 2003, with complaints of back pain. [Pru-Hawk 0722-0723]. She stated that the trigger point injections only helped 24 to 36 hours. Dr. Ellis suggested botox injections as soon as possible. *Id.* The record does not indicate that Hawk followed this suggestion.

On February 23, 2004, medical consultant, Dr. Joel F. Moorhead, specializing in Pain and Rehabilitative Medicine, provided his professional opinion regarding Hawk's ability to work. [Pru-Hawk 0562-0571]. Dr. Moorhead reviewed Hawk's medical records from January 2, 1997 through February 5, 2004. Dr. Moohead noted that although Hawk has a history of multiple back surgeries, there was no evidence of complications from the surgeries, nor was there evidence of compromise to any nerve or neural structure that might be responsible for her back or leg pain. *Id.* Further, he opined that there was no evidence of any medical comorbidities that would account for the level of pain reported. *Id.* Dr. Moorhead concluded that it would be reasonable to conclude that Hawk would be able to perform a wide range of office activities that involved frequent position changes, but that she should be restricted from stooping. *Id.* Ultimately, Dr. Moorhead opined that the available medical records "do not document any medically determinable physical impairment or combination of physical impairments that would prevent her from return[ing] to work." *Id.*

C.     Interpretation of the term "Total Disability"

Hawk argues that Prudential improperly interpreted the terms of the LTD plan, resulting in a denial of her claim for benefits. Whether Prudential was correct in its interpretation of the terms of the plan is reviewed *de novo*. *See Pierre*, 932 F.2d 1552. Under the *de novo* standard, this Court must interpret the plain language and apply it "in an ordinary and popular sense as would a person of average intelligence and experience, such that the language is given its generally accepted

meaning." *Wegner v. Standard Ins. Co.*, 129 F.3d 314, 818 (5th Cir. 1997).

The Prudential Long Term Disability policy states:

'Total Disability' exists when Prudential determines that all of these

conditions are met:

(1)     Due to sickness or accidental injury, both of these are true:

(a)     You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

(b)     After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. The Initial Duration is shown in the Schedule of Benefits.

(2)     You are not working at any job for wage or profit.

(3)     You are under the regular care of a Doctor.

[Pru-Hawk 0021].

The SPD states:

'Total Disability' means that:

(1)     Because of Illness or Accidental Injury, you are not able to perform for wage or profit the material and substantial duties of your occupation, nor are you, after the initial duration (the Elimination Period plus 24 months) of a period of Total Disability, able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience, and

(2)     You are not working at any job for wage or profit, and

(3)     You are under the regular care of a Physician.

All three conditions must be met to qualify for Total Disability LTD benefits.

[SPD at 116].

18

While there are subtle differences in pagination and word choice between the definition of Total Disability in the SPD and the Prudential policy, the test used to determine whether a claimant meets the definition is essentially the same.[4] After a *de novo* review of the record in this matter, it is the Court's finding that Hawk does not meet the definition of Total Disability as defined by either the SPD or the Policy. '

To qualify as totally disabled, Hawk must demonstrate three things: (1) that due to her illness she is unable to perform the material and substantial duties of her occupation or any job for which she is reasonably fitted by her education, training or experience; (2) she is not working at any job for wage or profit; and (3) she is under the care of a physician. There is no dispute that Hawk meets prongs two and three. The only issue of contention is whether Hawk is unable for perform the material and substantial duties of her occupation or any job for which she is reasonably fitted by her education, training or experience.

Prudential determined that Hawk did not meet this definition. Although Prudential determined that Hawk was disabled from performing her prior occupation as a Customer Service Representative, she was not precluded from performing any occupation due to her disability. Prudential relied on the opinion of Dr. Dossey, the Independent Medical Examiner, in reaching this decision. Dr. Dossey opined that Hawk retained the functional capacity to perform other occupations she had performed in the past which would allow her to frequently change positions. *See supra.*

---

[4]     The Prudential Policy provides discretion to Prudential to make the disability determination. As discussed *supra*, the Court must apply the language of the SPD.

Hawk appealed Prudential's decision to deny her LTD benefits; which was ultimately denied on March 10, 2004. In making its decision to deny Hawk's appeal, Prudential once again relied on the evaluation of Dr. Dossey. Prudential also considered the review by Dr. Moorhead, the medical consultant, as well as a vocational evaluation. *See supra.* Additionally, Prudential reviewed the medical documentation contained in the file. Consistent with its previous finding, Prudential determined that Hawk's condition did not meet the definition of "total disability" because she was capable of performing three identifiable jobs.

Prudential engaged the services of Concentra Managed Care, Inc., to perform a vocational evaluation of Hawk In a report dated July 20, 1998, Concentra identified several occupations that falling within Hawk's physical restrictions. [Pru-Hawk 0154-0157]. The record indicates that Hawk made no effort to obtain employment from any of the identified positions. *See id.*

It is the Court's determination upon a *de novo* review of the record that Prudential properly determined that Hawk failed to meet the definition of "total disability" as that term is defined by both the SPD and the Policy. The medical records reflect that Hawk does suffer from some degree of disability due to her lower back pain. However, evidence in the record suggests that Hawk could perform an occupation that allowed her frequently shift positions and to recline if necessary, and did not involve lifting more than 10 or 20 pounds. As such, she does not meet the requirements under the SPD or the Policy, which state that Plaintiff must be unable to perform the material and substantial duties of *any* job for which she is reasonably fitted based upon her education, training or experience.

## II.    Plaintiff's reliance upon La. R.S. §22:230

Hawk alleges in her complaint that the definition of "total disability" applied by Prudential is overly restrictive in light of Louisiana Revised Statute section 22:230.[5] *See* Complaint at ¶¶27-28. At the outset, the Court notes that this argument is not precluded by ERISA preemption. *See House v. American United Life Ins. Co.*, 499 F.3d 433, 455 at n9 (5th Cir. 2007). Section 22:230 "directly regulates the business of insurance and substantially affects the risk pooling agreements between insurers and insureds" and thus is exempt from ERISA preemption. *Id.*; citing to 29 U.S.C. §1144(b)(2)(A).

After a review of the definition of "total disability" as defined in the SPD, this Court finds that the definition is not overly restrictive pursuant to La. R.S. §22:230. [6]   The SPD definition requires that the claimant be unable to perform the material and substantial duties of her occupation, nor the material and substantial duties of any job for which the claimant is reasonably suited by her education, training or experience.   This definition is much less restrictive than those prohibited by La. R.S. §22:230, which specifically states that "total disability" cannot be based solely upon an individuals inability to perform in "any occupation whatsoever", "any occupational duty" or "any and every duty of her occupation." *See* La. R.S. §22:230 B(1).  Accordingly, the Court cannot agree with Hawk that the definition under either the SPD or the Policy is unduly restrictive under Louisiana law.

---

[5]     The Court notes that neither Plaintiff nor Defendants addressed this issue in their respective Motions for Summary Judgment, Oppositions thereof, or Briefs on the Merits.

[6]     The Court notes that the definitions of "Total Disability" under the SPD and the Policy are nearly identical.  Accordingly, the analysis of La. R.S. §22:230 is equally applicable to both versions.

21

### III.    Offset of Plaintiff's Social Security Disability Benefits

Hawk admits in her Complaint that "the SPD contains language which purports to authorize the Defendants to offset her LTD benefits by an amount equal to any SSD benefit she receives." *See* Complaint at ¶ 33. However, she argues that these provisions violate an ERISA participant's rights against forced alienation of ERISA benefits. *Id.* Hawk's argument on this issue is without merit.

ERISA's anti-alienation provision applies only to pension plans. *See Kennedy v. Plan Administrator for Dupont Savings and Investment Plan*, 497 F.3d 426, 429 (5th Cir. 2007). ERISA governs two types of employee benefit plans; employee welfare plans and employee pension plans. *See* 29 U.S.C. §§1002(1), 1002(3); *Tango Transport v. Healthcare Financial Services, LLC.*, 322 F.3d 888, 891 (5th Cir. 2003). An "employee welfare plan" is a plan, fund, or program established for the purpose of providing for its participants or their beneficiaries (though the purchase of insurance) medical benefits, disability benefits due to sickness or accident, benefits in the event of death or unemployment, as well as other smaller categories of benefits, such as vacation, provided by the employer. 29 U.S.C. §1002(1). An "employee pension plan" is a plan that provides retirement income to employees, or results in the deferral of income by employees. 29 U.S.C. §1002(2).

As stated *supra*, the anti-retaliation provision applies only to pension plans. *See Kennedy*, 497 F.3d at 429. ERISA does expressly bar the assignment of benefits provided for by pension benefit plans. *See* 29 U.S.C. §1056(d)(1). However, Congress chose not to impose such a limit on welfare benefit plans. *See Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837-838, 108 S.Ct. 2182, 2189-2190 (1988). "In a comprehensive regulatory scheme like ERISA, such omissions are significant ones." *Id.* "Congress' decision to remain silent concerning the attachment

22

or garnishment of ERISA welfare plan benefits acknowledged and accepted the practice, rather than prohibiting it." *Id.* Accordingly, this Court finds that Prudential's decision to offset Hawk's social security disability benefits does not violate ERISA's provisions regarding the alienation of benefits.

**IV.     Alleged Failure of Prudential to Provide Requested Documents in Violation of ERISA**

Hawk alleges that Defendants failed to provide her with information regarding the Plan despite her request in violation of 29 U.S.C. §1132(c). An administrator may be subject to penalties for failing to provide documents subject to ERISA's reporting and disclosure provisions. These documents include: (1) the plan itself, (2) the summary plan description, (3) annual report or summary thereof, and (4) a statement of a participant's accrued benefits. *See* James F. Jorden, Waldemar J. Pflepson, Jr., Stephen H. Goldberg, Handbook on ERISA Litigation §6.01 (3d Ed. 2009 supplement); 29 U.S.C. §1024(b)(4); 29 U.S.C. §1025(a). The decision to grant relief to a plan participant under 29 U.S.C. §1132(c) for failure to furnish requested documents is "committed to the discretion of the trial judge." *Godwin v. Sun Life Assur. Co. of Canada*, 980 F.2d 323, 327 (5th Cir. 1992); citing *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 363 (5th Cir 1981). Whether the Plaintiff was prejudiced by the failure to provide information is one factor the District Court may consider. *Id.*

Hawk's attorney requested a copy of the Master Plan document from Prudential, as well as information regarding the delegation of either fiduciary or administrative responsibility to Concentra, and documents regarding the appeal process at Prudential. [Pru-Hawk 0313-0314]. Prudential responded by letter dated March 7, 2000. [Pru-Hawk 0311-0312]. Prudential noted that it mailed a copy of the LTD Plan Document to Hawk's previous attorney on July 13, 1999, and that a phone call on February 23, 2000, confirmed that Hawk's current attorney was in possession of that

document. *Id.* Prudential described the role of Concentra, noting that Concentra was asked to perform a vocational assessment. *Id.* Lastly, Prudential described the appeal process in detail. *Id.* Accordingly, the Court finds that Prudential provided the information requested by Hawk, and declines to impose penalties under 29 U.S.C. §1132(c).

## CONCLUSION

For the foregoing reasons, all claims made by Plaintiff against Defendants are **DISMISSED WITH PREJUDICE.**

**THUS DONE AND SIGNED,** in Shreveport, Louisiana, this _23_ day of March, 2009.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE